**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| DAN BENNETT and | ) | |
| KAREN BENNETT, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 3:08-01212** |
| v. | ) | **Judge Sharp** |
| | ) | |
| CMH HOMES, INC. d/b/a LUV | ) | |
| NASHVILLE, | ) | |
| | ) | |
| **Defendant.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case arose after Plaintiffs Dan Bennett and Karen Bennett, husband and wife, purchased

a manufactured home from Defendant CMH Homes, Inc. d/b/a Luv, Nashville ("CMH Homes" or

"Clayton Homes"). In their Verified Complaint, Plaintiffs sued both CMH Homes and Southern

Energy Retail Corporation, d/b/a Southern Energy Homes, Inc. ("Southern Energy Homes"),

alleging breach of contract, breach of warranty, intentional and/or reckless misrepresentation,

promissory fraud, negligent misrepresentation, negligence/negligence *per se*, and violation of the

Tennessee Consumer Protection Act ("TCPA"). They sought both compensatory and punitive

damages, as well as recision.

On March 13, 2012, the Court entered an Order and Memorandum Opinion (Docket Nos.

118 & 119) relating to the Motions for Summary Judgment filed by both Defendants (Docket Nos.

56 & 60). The Court dismissed all of Plaintiffs' claims against Southern Energy Homes, and all

claims against CMH Homes, save for their breach of warranty and breach of contract claims.

On July 31 and August 1, 2012, the Court held a bench trial on Plaintiffs' remaining claims

1

against CMH Homes, after which the parties were instructed to file proposed findings of fact and conclusions of law, and responses thereto. The last of those filings was made on September 28, 2012.

Having reviewed the parties' proposed findings and conclusions, their arguments, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts which it deems to be immaterial to the issues presented.

## I. FINDINGS OF FACT

1. Plaintiffs' home in Rockvale, Tennessee burned down on August 30, 2004.

2. In the early part of 2005, Plaintiffs began searching for a new home, looking at various stick-built homes and lots.

3. During their search, Plaintiffs ended up on the Luv Homes lot in Nashville, Tennessee, a dealer of manufactured homes.

4. At Luv Homes, Plaintiff spoke with Linda Haun, who allegedly told them that manufactured homes were better than stick-built homes because their manufacture was regulated.

5. After looking at several floor plans and models, Plaintiffs settled on "The Georgetown," a 2,166 square foot, three bedroom, two bath home manufactured by Southern Energy Homes.

6. In addition to the basics, Plaintiffs requested numerous upgrades, including outside bricking, a double oven, a jacuzzi, additional phone jacks, and wooden decks at the front and rear

of the home.

7.  On January 27, 2005, Plaintiffs entered into a Sales Agreement with CMH Homes for the purchase of the manufactured home to be placed on Plaintiffs' property.  The total cash price was $160,230.00, which included $101,000.00 for the price of the home, $10,000.00 for exterior improvements, $45,487.00 to pay off the amount owed on Plaintiffs' 20 acres of land, and $3,943.00 in taxes.  (Pfs. Ex. 3).  "Normal delivery and installation" was included in the purchase price.  (Pfs. Ex. 4).

8.  At the end of March 2005, the manufactured home was delivered to Plaintiffs' property in three parts, consisting of the foyer and dining room, and two large units.  One of the large units was the front of the house and contained the kitchen, the master bedroom, and a bedroom with attached bathroom.  The other large unit was the back of the house, and contained the master bathroom, the living room, a utility room, a computer center, and another bedroom.

9.  Manufactured homes are joined together at what is called the "marriage line" where the separate units meet.  Such homes, when completed, do not have supports around the outside perimeter walls, but instead are supported under the I-beams and marriage lines.

10.  A crew of three to five individuals, headed by Ronnie Jones of Eagle Mobile Homes, spent the next several days installing the home.   At the time of the installation, neither Mr. Jones nor the members of his crew were certified or licensed to install the home.  However, LUV Homes is a licensed mobile home installer, and the home was installed pursuant to LUV Homes' license and bond.

11.  The installation crew was followed by other crews that installed the drywall, and otherwise finished the installation.

12. While the home was being installed, through the finishing process, and up until closing, Plaintiffs noticed "problems" with the home, including (a) what looked like some rotten wood used for studs; (b) shingles missing from the roof; (c) "gaps" at the end of the house; (d) textured, instead of the smooth ceiling ordered; (e) an electric, instead of the gas fireplace allegedly ordered; (f) carpeting that did not lay flat; (g) gaps around some doors; and (h) doors that would not stay opened or closed. This list of problems grew the longer Plaintiffs lived in the home, including (but not limited to) cracks in the wall and around the entertainment center, uneven floors, and electrical problems, such as lights going on and off over the entertainment center, and lights dimming when the air conditioner kicked on.

13. Plaintiffs closed on the house on May 13, 2005.[1] On that day, Ms. Haun did a walk-through and created a list of problems with the home. Plaintiffs also provided Ms. Haun with a list of problems they had noticed. Notwithstanding the problems, Plaintiffs closed on the home because, at that point in time, they thought their concerns would be addressed.

14. On the day of closing, Mr. Bennett signed another Sales Agreement. Mr. Bennett claims the document he signed consisted of only one page, and did not have a back page or a second page. Nevertheless, immediately above his signature is the following statement:

> Buyer(s) agree; (1) that the terms and conditions on page two are part of this agreement; (2) to purchase the above home including the options; (3) they received and acknowledge receiving a completed copy of this agreement; (4) that all promises and representations made are listed on this agreement; and (5) there are no other agreements, written or verbal, unless evidenced in writing and signed by the parties.

(Pfs. Ex. 4, p. 1).

---

[1] Between the time that their house burned and assumption of residence in their new home, Plaintiffs lived in an apartment in Murfreesboro, Tennessee.

15.  The standard Sales Agreement contains a second page that lists "ADDITIONAL TERMS AND CONDITIONS."  Among those is a clause titled "Limitations of Damages" which provides:

> If the manufacturer(s)' warranty is limited to repair or replacement and such warranty fails because of [sic] attempt at repair are not completed within a reasonable time or the manufacturer(s) has (have) gone out of business, Buyer(s) agree(s), that if they are entitled to any damages against the Seller, the damages are limited to the lesser of either the cost of needed repairs or reduction in the market value of the unit caused by the lack of repairs.  In any case, the Seller will not be required to pay the Buyer(s) any incidental or consequential damages.  Buyer(s) also agrees [sic] that once the unit has been accepted, even though the manufacturer(s)' warranty does not accomplish its purpose, that the Buyer cannot return the unit to the Seller and seek a refund for any reason.

(Id. p. 2).

16.  At closing, Plaintiffs also signed a "RETAILER CLOSING AGREEMENT" which provided certain limited warranties:

> 1.  For **new homes**, installation at the initial homesite will be completed in accordance with applicable governmental requirements, and installation of new appliances or equipment will be in accordance with manufacturers' specifications and free from defects in materials or workmanship, which warranties extend for a period of 90 days (one year in Texas) from original delivery.
>
>      *             *             *
>
> 3.  All **implied warranties**, including implied warranties of merchantability, habitability, or fitness for a particular purpose, are disclaimed to the fullest extent permitted by applicable law, and otherwise extend only for the period of Retailer's applicable limited warranty for the home.

(Pfs Ex. 5, p.1, bold in original).

17.  On June 17, 2005, Mr. Bennett sent Michael Evans of Clayton Homes a letter that attached a long list of problems Plaintiffs had discovered in the home.  The list included items on the original list that had been provided to Ms. Haun, as well as many others, and contained

complaints about problems both on the inside and the exterior of the home. Many of the problems were believed by Plaintiffs to be due to the fact that, in their opinion, the house was not level – it was "crooked."

18. Sometime in or around July 2005, Mr. Evans met with Plaintiffs at their home to go over the complaints identified in the attachment to the June 17, 2005 letter. Also present was Daryl Stone of Clayton Homes. At the meeting, Mr. Bennett was given a list, with an "L" or an "S" listed next to items to be corrected. The "L" signified that the correction was to be made by Luv Homes, while the "S" indicating that the correction was to be made by Southern Energy Homes. The list included problems in virtually every room, ranging from door knobs being out of line, to grout falling out, to ill-fitting lights and receptacles, to crooked and improperly joined moulding. Problems on the outside were said to include "extreme moisture" under the home, leaking gutters, and improperly built decks.

19. Shortly after this meeting, Pat Myers at Clayton Homes assumed responsibility over Plaintiffs' complaints. However, he did not receive the long list of items provide to Mr. Evans, and, in fact, claimed to be aware of only two problems with the home, including issues surrounding the deck.

20. On October 10, 2005, Mr. Bennett spoke with Mr. Myers and attempted to relay to him all of the problems Plaintiffs had discovered in their house. The two agreed that Mr. Myers should look at the house himself, and Mr. Bennett sent Mr. Myers the list he had previously presented to Mr. Evans.

21. It was not until April 3, 2006, that Mr. Bennett again spoke to Mr. Myers. At the time, it was agreed Mr. Myers would come out to the residence the following Friday.

22. On May 24, 2006, Mr. Bennett again spoke with Mr. Myers. Between the April 3, 2006 and May 24, 2006 phone calls, no one from either Clayton Homes or Southern Energy went out to Plaintiffs' residence, nor had many of the problems in the June 2005 list been resolved, even though some crews had been sent out in the past.

23. On August 17, 2006, Kerry Pounds of Southern Energy Homes went to Plaintiffs' residence pursuant to a "Request for Service" that listed at least 15 items that needed attention. Mr. Pounds addressed some cosmetic matters, including replacing a section of carpeting.

24. Mr. Bennett claims he was told by Mr. Pounds that the house was not level, and that the problems would recur until the house was level.

25. At the end of Mr. Pounds' time at the residence, most of the items were checked as "completed." Some of the items, however, were marked as both "completed" and "uncompleted," including that the floor was to be checked at the "marriage line," and at the living room window. Next to the item relating to the marriage line appears the handwritten notation, "marriage line unlevel needs reset." (Pfs. Ex. 8, p. 1). The line next to the issue about the "rippled" carpet in the hall and living room was marked "uncompleted," with the handwritten notation "needs streched [sic] when home releveled." (Id., p. 2).[2]

26. Mr. Bennett signed the "Request for Service," below the pre-printed statement "certify[ied] that the work described hereon have [sic] been furnished and the repairs made to my satisfaction." However, immediately underneath the signature line is a notation handwritten by Mr. Bennett that states: "House unlevel, several problems remaining to be addressed by Pat Myers &

---

[2] It is unclear as to who made these handwritten notations, but, as pointed out below, Mr. Bennett was the one who made a handwritten remark at the bottom of the "Request for Service," and he may have made the other handwritten notations as well.

Tupper Baker Clayton Cor. All repaires [sic] not complete." The notation is initialed "D.B." and "K.P." ( Id.).

27. On September 11, 2006, Mr. Bennett sent a letter and complaint to the Manufactured Housing Section of the Tennessee Department of Commerce and Insurance. The complaint identified 19 separate problems (most of which had already been raised in the past), including problems with the drywall and brick, doors that would not close, vinyl siding issues, and improperly installed decks. Front and center was Plaintiffs' complaint that the house was not level, the floors were uneven, and the belief that the home was improperly installed.

28. On October 5, 2006, Luv Homes filed its response to the complaint, addressing each of the issues identified. With respect to the contention that the house was not level and not assembled properly, Luv Homes wrote:

> We feel the home has been assembled correctly. We have had 3 Regional Managers plus others that have been to this home and feel it is assembled correctly and also that it is level – checked by water level. We are willing to show customer again.

(Pfs. Ex. 10, p. 1). Luv Homes also wrote:

> We have many service sheets where Mr. & Mrs. Bennett signed and initialed of [sic] after each item was completed on service. There have been 8 or 10 different service people on this because Mr. Bennett will not allow "Luv" to service his home. There have been 4 "walk throughs" on this home: one by the salesperson, one by an Asst. Regional Manager, and two by 2 different Regional Managers. If there is a problem, we are more than glad to repair the problem. We cannot fix something that is not wrong, but are more than willing to fix whatever is wrong.
>
> Southern Energy has been there 4 or 5 times. Once or twice, Mr. Bennett would not let them do repairs. We at "Luv Homes" would invite a state inspection.

(Pfs. Ex. 10, pp. 1-2).

29. Mr. Bennett claims that no one from Luv Homes or Southern Energy Homes put a water

level on his home, or showed him that it was level. He does admit that many individuals had been out to his house to look at and/or attempt repairs, but claims that he only refused to allow Mr. Jones and his crew to work on the home because they were the ones who, from Mr. Bennett's perspective, had improperly installed the home in the beginning.

30. In early November 2006, state inspectors John Davis and Ray Henderson conducted an inspection of Plaintiffs' home. Among the findings[3] issued thereafter was that the ceiling needed repair, duct work under the home needed to be repaired, vents needed to be added at the front of the house, and the decks should not have been attached to the home. The report also found that "[t]he home is more than two inches out of level on what was check [sic] with water level, {note only one third of home was checked and the entire home should be releveled}." (Pfs. Ex. 13, p. 2.). The report also stated that "HOMEOWNER HAS PROBLEMS WITH DOORS NOT STAYING OPEN. THE HOME IS UNLEVEL, REPAIRING THIS SHOULD REMEDY THESE ISSUES." (Id. p.2, capitalization in original). The report assigned responsibility for addressing the leveling issue to the seller. (Id. p. 3).

31. On January 22, 2007, the State received a Response Sheet from Luv Homes indicating that a contractor, using a level, confirmed the house was level within manufacturer's standards, that the doors appeared to be squared, and that the decks appeared to be "constructed well." (Pfs. Ex. 14).

32. On January 29, 2007, Mr. Bennett had a discussion with Tupper Baker, Vice President

---

[3] Cosmetic problems are not within the purview of state inspectors, although consumers are directed to list all problems in their complaints since the problems, may or may not, violate code requirements or regulations.

of Clayton Homes.[4]  During the course of that discussion, Mr. Bennett told Mr. Baker that all he ever

wanted was to have his house fixed.  Mr. Baker indicated that he wanted a happy customer, but if

the house was in "tolerance," there was not a lot that could be done.  He did, however, indicate that

he and Keith Clotfelter, a subcontractor for Clayton Homes, would come out to look at the house.

33. On February 22, 2007, Mr. Davis and Douglas Strong, another state inspector, conducted

a follow-up inspection.  In attendance were several people from both Southern Energy Homes and

Clayton Homes.  At the inspection, Mr. Davis made the following "Observations":

> A re-inspection was performed on the Bennett home in response to the dealer
> stating home was level.  Below are findings of said inspection.
>
> #1 The digital water level indicated the home to be more than 2" uneven from 1 half
> to the other.  There are 5 piers along the A section that are not in contact with the I
> beam there seems to be a bow in the chassis.  Many piers under home have lose
> wedges or no wedges.  The halves of the home have been installed at an off set
> putting the home in a bind.  Damage to chassis will need to be repaired and may have
> to be repaired off site.  There are numerous problems with the piering of this home
> at the next inspection the State of Tennessee will require that Mr. Tupper Baker be
> present.
>
> #2 The electrical crossover is hanging loose under home along with the water
> crossover. [5]
>
> #3 There is still not enough vents in the underpinning And there is mold on the
> bottom board.

Pfs. Ex. 15, p. 2, scrivener's errors in original, footnote added).  Responsibility for the corrections

was placed on the dealer.[6]

---

[4]  Mr. Baker left his employment at Clayton Homes in December 2010.

[5]  At trial, Mr. Davis testified that the electrical crossover hanging loose was "bad" and made him "a
little angry" because it presented a fire hazard.  (Tr. Trans. at 341-42).

[6]  Although the first inspection placed responsibility for fixing the venting problem on Plaintiffs, this
inspection concluded that the dealer was to investigate and/or correct "all observations."  (Id. at 3).  Thus,
the Court does not believe, as Defendant insists, that Plaintiffs made "a blatant attempt to mislead the Court"

34. On March 22, 2007, Mr. Baker and several other representatives of Clayton Homes and Southern Energy Homes went to Plaintiffs' home. In a discussion, Mr. Bennett told Mr. Baker that living in the home for the past two years had been "miserable," the house was defective, he and his wife had repeatedly complained about the problems, and nothing was done to resolve the problems.

35. At the request of CMH Homes, Eric. J. Tompos, P.E., Vice President of NTA, Inc., performed an inspection of the underside of Plaintiffs' home on March 27, 2007. Upon inspection, he observed "no obvious signs of damage or distress" to the chassis frame. His investigation also revealed sagging areas of flooring because several of the foundation piers were not in contact with the underside of the I-beam, and a sag near the sidewall was due to the floor decking not resting on the joist below. He recommended that, at the marriage line, "the supporting-piers should be shimmed tightly . . . as required to remove the sag," and that, if the sag could not be removed by shimming alone, "it may be necessary to disconnect the halves of the home to relieve any strain created by the existing installation." (Defs. Ex. 2).

36. Mr. Baker was present when Tompos inspected the home, and told Plaintiffs that the house had been put together improperly and that CMH would either buy it back, or fix the problem. Mr. Bennett claims similar promises were made on several other occasions.

37. On April 19, 2007, Baker sent Plaintiffs a letter, proposing that Mr. Clotfelter and his crew reset the home which would involve unbolting and rebolting lag bolts, and make other repairs, after which the home would be reinspected, a process that was to last "several consecutive days." (Pfs. Ex. 17). As an alternative, Mr. Baker proposed that CMH would buy back the home.

38. On June 27, 2007, Mr. Bennett sent Mr. Clotfelter a list of the problems in the home.

---

(Docket No. 175 at 4) by asserting that CMH was responsible for correcting the venting problem.

The list spanned 6 pages and included the items that Plaintiffs had repeatedly complained about in the past.

39.   Early in July 2007, Plaintiffs received another letter from Mr. Baker regarding Mr. Clotfelter coming out to make repairs.  Mr. Bennett understood from the letter and conversations he previously had with Mr. Clotfelter that the repairs would last several days, during which time he and his wife would have to stay in a hotel.

40.   In early November 2007, Mr. Clotfelter went to the residence and spent a couple hours under the home.  Whatever he did while under the house[7] did not correct the problem with the slope in the floor.

41.   Mr. Bennett had yet another discussion with Mr. Baker on November 21, 2007.  During this discussion, he complained once again about the many things that were wrong with the house, and claimed there was no way to make it right.  Mr. Baker conceded, notwithstanding the many man-hours spent on the home, "unless the frame's right, nothing is going to take."  (Tr. Trans. at 194).[8]

42.   On December 6, 2007, Baker, and state inspector Davis went to Plaintiffs' house.  Who else was, or was not, in attendance is a mystery.

43.   According to Plaintiffs, Mr. Davis was accompanied by Mr. Henderson.  Plaintiffs did not see Mr. Strong that day, even though most of the conversations occurred in front of a living

---

[7]  Mr. Bennett claims Mr. Clotfelter "went under the house, spent a couple of hours, just hammered some boards into the gap where the frame wasn't touching and left."  (Tr. Trans. 192).  Mr. Clotfelter did not testify at trial.

[8]  In his testimony, Mr. Davis testified that "if a home is not level, pretty much anything that's got to be done on the inside is a moot point until you make sure the house is level . . . because if you have to change the level of the house, on the inside it can move baseboards, it can move ceiling walls.  It can do all kinds of stuff."  (Id. at 327).

room window overlooking the entry to the underside of the house, Mr. Davis never indicated that Mr. Strong was under the house, and Mr. Davis referred to picking up "Ray" on the way to Plaintiffs' house. Mr. Davis testified that any mention of "Ray" was inadvertent, that "Ray" was not present, and that Mr. Strong went under the house and, unbeknownst to Plaintiffs, conducted an inspection. By deposition, Mr. Strong testified that he was at the house that day, and conducted an inspection.

44. The Court finds Davis' and Strong's testimony that the latter was present at the house on December 6, 2007 suspicious. Regardless, the Court also finds by a preponderance of the evidence that, if Mr. Strong did in fact accompany Mr. Davis, Mr. Strong did not perform an inspection that showed the house to be level. Several factors lead the Court to this conclusion. First, the Court finds Mr. and Mrs. Bennett's testimony that they did not see Mr. Strong at their home and saw no one go under their home that day credible. Second, the Court does not find Mr. Davis's testimony about Mr. Strong being present credible, particularly since Mr. Davis repeatedly referred to "Ray." Third, even though Mr. Baker was present at the home and called as a witness in this case, he was not asked to confirm that Mr. Strong was also present.[9] Fourth, while Mr. Strong's deposition was introduced at trial, he was not called as a live witness and the Court has no way to assess his credibility. Fifth, the house had been inspected by state inspectors on two occasions in the past, found not to be level, and a report was presented which indicated those findings. Sixth, there is no credible evidence that anyone (including Mr. Clotfelter) did anything to remedy the problem. Seventh, Mr. Strong claims to have given his notes to Mr. Davis for inclusion in a report,

---

[9] While Mr. Baker testified that "[t]he State sent someone under the home" and "they told me the home was not level," he did not say that he personally saw anyone go under the home. (Tr. Trans. at 430).

and Mr. Davis claims to have prepared such a report, but no report was presented at trial, and Mr. Davis claims the report cannot be found.

45.   In April 2011, James Bauer, the Director of Quality Assurance and Code Conformance for Southern Energy Homes inspected Plaintiffs' home and took numerous pictures, 13 of which were introduced at trial.  By the time of his inspection, the decks had been removed,[10] although he could see that they had been attached to the house because of the holes for the lag bolts.

46.   Mr. Bauer went underneath the house and inspected the piers.  He did not, however, put a level on the home and could not say whether the home was level or not.[11]

47.   Based on the foregoing findings, the Court also finds by a preponderance of the evidence,  the following overriding facts relating to the issue of liability:

(A) Plaintiffs' home was not installed by licensed personnel;

(B) The home was not installed correctly; and

(C) The home was not leveled when it was installed, the problem was not corrected, and this has led to numerous and continuing problems with the home.

## II.  CONCLUSIONS OF LAW

### A.  Liability

"'The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract.'" Ingram v. Cendant Mobility Fin. Corp., 215 S.W.3d 367, 374

---

[10]   The rear deck was removed after collapsing while Mrs. Bennett was on it.  The large deck was replaced by prefabricated steps.

[11]   During trial, Mr. Bauer confirmed that he testified during his deposition that he found the rippled carpet to be "offensive.  (Tr. Trans. at 220-21).

(Tenn. Ct. App. 2006) (quoting <u>ARC LifeMed, Inc. v. AMC-Tenn., Inc.</u>, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Plaintiffs have proven each of those elements by a preponderance of the evidence.

The parties entered into enforceable contracts in the form of the Sales Agreement and the Closing Agreement. The Sales Agreement provided that "[n]ormal delivery and installation are included in the purchase price," while the Closing Agreement provided that "installation at the initial homesite will be completed in accordance with applicable government requirement[.]" The Court finds that Defendant breached those agreements because the manufactured home was not installed by licensed contractors, and was not leveled, resulting in damages to Plaintiffs.

With regard to licensing, Defendant argues installation was performed in accordance with Tennessee law because the proof showed that the home was installed pursuant to LUV Homes' license and bond. In support of that position, Defendant relies on Tenn Code Ann. § 68-126-404 (a) which provides, in part, that "[a]ny subcontractor used by an installer to perform installation work . . . shall be duly licensed as an installer or shall be covered under the installer's bond." That statute, however, also provides in the very next sentence that "[a]t least one (1) person who actually performs installation work at the site shall be certified by the commissioner in accordance with subdivision (d)(2)," <u>id.</u>,[12] and the preponderance of the evidence is that none of the workers on the installation crew was licensed.

---

[12] In its entirety, subsection (a) provides:

> a) No person may install a manufactured home in this state unless such person is licensed by the commissioner as an installer. Any subcontractor used by an installer to perform installation work in accordance with § 68-126-205 shall be duly licensed as an installer or shall be covered under the installer's bond. At least one (1) person who actually performs installation work at the site shall be certified by the commissioner in accordance with subdivision (d)(2).

Tenn. Code Ann. § 68-126-404(a).

The Court rejects Defendant's assertion that Plaintiffs failed to carry their burden of proof because they only showed that Mr. Jones did not have a license, and did not elicit any testimony as to the licensing status of the rest of the crew. No doubt, if any of the members of the installation crew were licensed, Defendant would have presented that fact at trial, but did not. "An omission by a party to produce evidence in elucidation of the subject-matter in dispute which is within his capabilities and peculiarly within his own knowledge, "'frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.'" Baker v. Hooper, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001) (quoting, Doughty v. Grills, 260 S.W.2d 379, 391 (1952)); see, Willerson v. State , 478 S.W.2d 907, 910 (Tenn. Crim. App. 1972) ("Thus, where a charge is made that the defendant carried on a certain business without a license, the fact that he has a license is peculiarly within his knowledge and he must establish that fact or suffer conviction" because "the party, if licensed, can immediately show it, without the least inconvenience").

Defendant also argues that, even if the home was not installed by licensed installers, Plaintiffs suffered no injury because the proof was that Mr. Jones had, in fact, obtained his first certification on November 18, 2003, the certification expired in October 2004, and Mr. Jones renewed the certification in May 2005. Because Mr. Jones was certified through October 2004, Defendant submits, he must have "taken the fifteen-hour course regarding installation prior to the date Plaintiffs' home was installed" and "[t]herefore Mr. Jones ostensibly possessed the requisite knowledge regarding home installation." (Docket No. 171 at 11). While Defendant characterizes Mr. Jones' lapsed license as "a technical, administrative violation," involving a crew member's failure "to submit paperwork in a timely manner," (id.), the omission is much more problematic than

that because, under the Tennessee Code, "[i]t is unlawful to occupy any manufactured home in this state, unless the manufactured home has been installed by a person licensed by the commissioner to make such installation." Tenn. Code Ann. § 68-126-403(a).

Regardless, Defendant breached the contract by installing a home that was not level and was not made level when the problem was brought to its intention. During trial, the evidence was clear that the law regulating the manufactured home industry requires that homes be level within certain parameters, and Plaintiffs' home was not.

In this regard, Mr. Davis testified that, when he inspected the home in November 2006, he found six items "that needed to be fixed to bring the house to code," including the fact that the home was more than two inches out of level. (Tr. Trans. at 331 & Pfs. Exh. 13). Likewise, when Mr. Davis inspected the home in February 2007, in response to Luv's representation that the home was now level, he found the home "to be more than 2" uneven from 1 half to the other," (Pfs. Exh. 15). This evidence fully supports the conclusion that the home was not installed properly, in violation of the agreements between the parties.

Because the Court finds the house was not level when installed and the problem has not been fixed, the Court also finds that Plaintiffs have established that they have been damaged.

Defendant's former Vice President, Mr. Baker, conceded at trial that "[t]here were issues that was [sic] being caused by that floor not being level. No doubt," including that "the doors did not shut properly." (Tr. Trans. at 426). Mr. Baker also testified that Clayton Homes did not dispute that there was a problem with the deck being attached to the house. (Id. at 427). Additionally, in a conversation recorded by Mr. Bennett, Mr. Baker stated, "we've all said that until we get the frame right that you're not going to fix anything," and that "unless the frame's right, nothing is going to

take." (Tr. Trans. at 198). In a similar vein, Mr. Davis, the state inspector, testified that "if a home is not level, pretty much anything that's got to be done on the inside is a moot point until you can make sure the house is level . . . because if you have to change the level of the house, on the inside it can move baseboards, it can move ceiling walls . . . [i]t can do all kinds of stuff." (Id. at 327).

The Court also finds that Plaintiffs have established their breach of warranty claim by a preponderance of the evidence.

"In order to state an actionable claim of breach of warranty and/or violation of the Magnuson–Moss Act, a plaintiff must demonstrate that (i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts." Temple v. Fleetwood Enters., Inc., 133 Fed. App'x 254, 268 (6th Cir. 2005). This Court has already discussed the first two elements in its discussion on Plaintiffs' breach of contract claim, that is, (1) Defendant warranted that the home would be installed in a "normal" fashion and in accordance with governmental regulations; and (2) the house was not installed by licensed installers, nor was it level and, hence, did not conform to the warranty.

The Court has also addressed the remaining two elements, at least by implication, because, despite being given ample opportunity to cure the problem with leveling the home, Defendant has not done so. In this regard, the Court rejects Defendant's "law of the case" argument based upon this Court's prior ruling in relation to Southern Energy Home's Motion for Summary Judgment.

As Defendant correctly notes, the Sixth Circuit in Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 308 (6th Cir. 2008) wrote: "Under the law-of-the-case doctrine, rulings made at one point in the litigation should continue to govern in subsequent stages of that litigation." However, that language

was immediately followed by the following observations: "The doctrine merely directs the court's discretion; it does not limit the court's power. . . . The doctrine has no application where the issue in question was not previously decided." Id.

In granting summary judgment for Southern Homes on the breach of warranty claim, the Court wrote:

> The Court finds that Southern Energy Homes cured the defects for which it was responsible within a reasonable time. Davis testified that, by the time of the follow-up inspection of February 2007, Southern Energy Homes had taken care of all the issues that it was supposed to address, based on the initial inspection conducted three-and-a-half months prior. (Docket Entry No. 63-5, at 30:13-19.) All the remaining issues were the responsibility of CMH Homes as the dealer. (Id. at 30:9-12, 31:1-4; see also Docket Entry No. 59-4, Exhibit 5.). Because Plaintiffs cannot make out an element of their breach of warranty claim, Southern Energy Homes is entitled to summary judgment on this claim.

(Docket No. 118 at 11). This language can hardly be said to be the "law of the case" as to Defendant because, in an accompanying footnote, the Court wrote that, with respect to CHM Homes, "the entire claim for breach of warranty will be decided by the trier of fact." (Id. at 11 n.3).

That aside, even if the passage can be read to suggest the "law of the case" is "that a few months is a reasonable time to complete repairs identified in the State report," (Docket No. 171 at 21), this Court's findings make clear that CMH Homes did not accomplish the repairs by the time of the final inspection in November 2007. Moreover, even if CHM Homes had corrected the problems with the home by the final inspection, almost an entire year passed between the first and last inspections, hardly the few months at issue between the first inspection in December 2006 and the second inspection in February 2007, which the Court addressed in its previous ruling relating to Southern Homes. Finally, the state law requirement that licensed installers be utilized was not at issue with respect to the breach of warranty claim against Southern Homes.

Based upon the foregoing, the Court will enter an Order finding liability in favor of Plaintiffs and against CMH Homes on Plaintiffs' breach of contract and breach of warranty claims.

**B.  Remedy**

Having found liability in favor of Plaintiffs, the issue next becomes the appropriate remedy. Plaintiffs seek both revocation of acceptance and money damages.

The "remedy of revocation of acceptance 'for all practical effect replaces the old equitable doctrine of rescission.'" Watts v. Mercedes-Benz USA, LLC, 254 S.W.3d 422, 425 (Tenn. Ct. App. 2007). "In seeking the remedy of revocation of acceptance, what a plaintiff is essentially asking for is a refund of the purchase price in exchange for a return of the defective goods purchased." Id. "Damages for breach of contract, on the other hand, place the injured party, as nearly as possible, in the same position he would have been if the contract had been performed." Ingram v. Beazer Homes Corp., 2003 WL 1487251 at *8 (Tenn. Ct. App. 2003). Whether to grant revocation of acceptance or rescission is a matter of discretion for the trial court, but "if an award of damages would be an adequate remedy, rescission will not be granted." Case Handyman Serv. of Tennessee, Inc. v. Lee, 2012 2150857 at * 6 (Tenn. Ct. App. June 13, 2012).

At this point in time, the Court has not definitely decided the appropriate remedy to be awarded Plaintiffs, and will give the parties an opportunity to pursue settlement of this case now that liability has been decided. Hopefully, that opportunity will not be squandered, and the parties will negotiate in good faith and arrive at a mutually agreeable resolution of this matter.

Although the Court defers final ruling on the appropriate remedy, the Court has made some preliminary determinations and makes certain observations that may be of benefit in the parties'

negotiations:

(1) "Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties." BVT Lebanon Shopping Center, Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001) (citation omitted). This is because "[t]he purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than she would have been if the contract had been fully performed." Id. Moreover, Plaintiffs have "the burden of proving the damages sustained," and, "[w]hile damages do not have to be proved exactly, they must be proved with a reasonable degree of certainty to allow the trier of fact to make a fair assessment without speculation." Stonecipher v. Estate of Gray, 2001 WL 468673 at *6 (Tenn. Ct. App. 2001). In light of these principles, Plaintiffs should give due consideration as to whether all of the types of damages they seek are recoverable as a consequence of the breach, and whether any competent *evidence* exists in the record for the types of damages claimed.

(2) If revocation of acceptance is granted, Defendant would likely be entitled to some sort of set-off, a proposition with which Plaintiffs agree. "[T]he general rule is that the burden of establishing set-off is upon the defendant." Wilson v. Hill, 1992 WL 52711 at *2 (6th Cir. 1992) (citing, Polk v. Torrence, 405 S.W.2d 575, 576 (1966)). While CMH Homes posits that "Plaintiffs have provided two different figures that could be used to calculate the reasonable use value – the cost to rent a comparable apartment and the mortgage payment for the home," (Docket No. 171 at 29), query whether either is an appropriate yardstick in light of the condition of the home as

described at trial, the fact that the apartment figure was based on it being furnished, and the fact that the mortgage figure included interest.

(3) As a general rule, punitive damages "are not proper in breach of contract cases," although they may be awarded "in cases involving 'fraud, malice, gross negligence, or oppression.'" Medley v. A.W. Chesterton Co., 912 S.W. 2d 748, 753 (Tenn. Ct. App. 1995) (citation omitted). Further, "an intentional and reckless finding" on a breach of warranty claim, places "the case in the class of cases where courts have found an exception to the rule that no punitive damages may be awarded for breach of contract cases." Mohr v. Daimler Chrysler Corp., 2008 WL 4613584 at *15 (Tenn. Ct. App. Oct. 14, 2008). Nevertheless, "[t]he trial court may [only] award punitive damages if it finds, by clear and convincing evidence, that a defendant's wrongful actions were intentional, fraudulent, malicious, or reckless." White v. Empire Exp., Inc., 2012 WL 4497280 at *21 (Tenn. Ct. App. Sept. 27, 2012) (citing, Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn.1992)). Having listened to the testimony at trial, and having thoroughly reviewed the trial record in formulating the above Findings of Fact and Conclusions of Law, the Court finds no clear and convincing evidence that punitive damages are appropriate in this case, and, therefore, punitive damages will not be awarded.

(4) The purpose of prejudgment interest is to fully compensate a plaintiff for the loss incurred while a case winds its way through trial. See, Meyer v. Amerisource Bergen Drug Corp., 264 Fed. Appx. 470, 479 (6th Cir. 2008). However, any award of prejudgment interest may be reduced for the delay occasioned by Plaintiffs in this case, including the fact that the trial was twice continued on Plaintiffs' request, and over the objection of Defendant. See, Metro. Gov't of Nashville & Davidson County v. BFI Waste Serv. LLC, 2012 WL 1018946 at ** 12-13 (Tenn. Ct. App. Mar. 22,

2012) (noting that among factors to be considered in award or denial of prejudgment interest is unreasonable delay of the proceedings by a party); see, Benetic v. M/Y Athena Alexander, 113 Fed. App'x 757, 759 (9th Cir. 2004) (finding district court "correctly awarded prejudgment interest reduced by the period of undue delay" caused by plaintiffs).

(5) Tennessee law provides that an agreement "may limit or alter the measure of damages recoverable" Tenn. Code Ann. § 47-2-719, and while the partes entered into a Sales Agreement that ostensibly limits damages to the lesser of either the cost of needed repairs or the reduction in the market value caused by the lack of repairs, such limitations on remedies may not be enforced where it is unconscionable to do so. Id. "Whether a contract term is unconscionable is a question of law." Fifth Third Leasing Co. v. Cherokee Pontiac, 2002 WL 407224 *2 (Tenn. Ct. App. 2002). The Court reserves ruling on that legal question at this time, thereby leaving open the possibility that the limitations on remedies under the agreement are unconscionable.

(6) While "Plaintiffs agree that ordinarily mental anguish is not recoverable in a breach of contract claim," they argue that, because this case "involves the Uniform Commercial Code," they are entitled to recover for mental anguish because a buyer "can recover 'injury to person or property proximately resulting from any breach of warranty,'" and "mental anguish" is "an injury to person." (Docket No. 176 at 33, quoting Tenn. Code Ann. § 47-2-715). Plaintiffs do not cite any cases which have awarded damages for mental anguish under the U.C.C., and the law appears to be to the contrary:

> [T]he UCC is to be construed to "make uniform the law among the various jurisdictions." . . . Those courts that have considered the issue have determined that emotional damages are generally not recoverable in a standard breach of warranty action under the UCC. See, e.g., Chambley v. Apple Restaurants, Inc., 233 Ga. App. at 504-05, 504 S.E.2d at 556-57 (holding that damages for "psychic injuries" not available as consequential damages for breach of warranty under the UCC); Kwan

v. Mercedes-Benz of North America, Inc., 23 Cal.App.4th at 187-92, 28 Cal.Rptr.2d 371 (discussing in detail law on emotional distress claims in warranty and contract cases and holding that emotional distress damages not available for breach of warranty under the UCC in a contract for sale of a car); Woodward v. Naylor Motor Sales, 1974 WL 21755 (holding that mental distress damages not available for breach of warranty where sale of car was not of a deeply personal nature).

Pedroza v. Loma Auto Mall, Inc., 625 F. Supp.2d 1156, 1161-62 (D.N.M. 2009). In the absence of any controlling authority to the contrary, the Court will not award damages under the U.C.C. for Plaintiffs' alleged mental anguish. Moreover, Plaintiffs have failed to establish to the Court's satisfaction the "severe mental injury" usually associated with an award for mental anguish. See, Rogers v. Louisville Land Co. , 367 S.W.3d 196, 210 (Tenn. 2012) (setting forth the standard to be utilized in determining whether to award damages for emotional distress due to outrageous conduct).

## III. CONCLUSION

On the basis of the foregoing, the Court will enter an Order finding in favor of Plaintiffs and against Defendant on Plaintiffs' claims for breach of contract and breach of warranty. The Court will defer ruling on the appropriate remedy, and allow the parties the opportunity to explore the possibility of settling of this case.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE